**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**FOR A SEARCH WARRANT FOR A TARGET TELEPHONE**

I, Michael J. McGee, being first duly sworn, hereby depose and state as follows:

<u>Introduction and Agent Background</u>

1.      I submit this affidavit in support of an application for a search warrant pursuant to Rule 41 of the Federal Rules of Criminal Procedure to download and forensically search the contents of a black iPhone in a black case, with assigned call number: (603) 818-0291, which law enforcement seized on June 23, 2025 from Cesar Joel Perez Mejia ("Perez Mejia"), and which is now in the lawful custody of the Federal Bureau of Investigation ("FBI") at a secure FBI office in Manchester, New Hampshire ("Target Telephone"). The Target Telephone is described and depicted herein and in Attachment A, and the items to be seized from the Target Telephone are discussed herein and described in Attachment B.

2.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516.  I also am a "federal law enforcement officer" within the meaning of Fed. R. Crim. P. 41(a)(2)(C) and authorized to apply for the requested search warrant.

3.      I am employed as a police officer with the Manchester, New Hampshire Police Department ("MPD") and have been so employed since July 2014.  Since March 2021, I have also been a Task Force Officer ("TFO") for the Federal Bureau of Investigation and a member of the New Hampshire Major Offender Task Force, which

works to dismantle and disrupt criminal groups like Drug Trafficking Organizations ("DTOs") and street gangs operating in New Hampshire and Massachusetts. I am the primary case officer with responsibility over the investigation described herein.

4.      During my law enforcement career, I have had the opportunity to search, seize, and personally observe what I have recognized to be, and what was later confirmed through laboratory analysis, controlled substances like fentanyl, crack cocaine, powder cocaine, heroin, methamphetamine, marijuana, hashish, and illegally manufactured and obtained pharmaceutical drugs. In addition to attending trainings about narcotics and gang interdiction, I have physically and electronically tracked and surveilled drug traffickers, bought drugs from drug dealers while operating as an undercover officer ("UC"), debriefed drug dealers, confidential sources ("CS"), and other witnesses with personal knowledge about DTOs and the way they operate, arrested targets of narcotics investigations, reviewed recorded conversations like phone calls and electronic messages, and reviewed telephone, financial, and drug records, all related to drug trafficking. I have also been the affiant on and have led or assisted in the execution of search warrants in which common "tools" of the drug trade were found, like drugs, drug proceeds, drug paraphernalia, and firearms. I have also been a member of several specialized units at MPD including the Anti-Crime Unit and the Gang Prevention Unit, both of which focused on deterring and apprehending violent offenders and gang members in Manchester. I have also received specialized investigatory training in numerous areas including gang investigations, drug investigations, criminal interdiction, and

am a certified Professional Gang Investigator by the East Coast Gang Investigators Association.

5.      The facts in this affidavit come from my personal observations, my personal training and experience, and the information that I have received from other law enforcement agents and witnesses involved in this and other investigations. This affidavit is intended to show merely that there is sufficient probable cause for the issuance of the requested criminal complaint and arrest warrant and does not set forth all my knowledge about this matter.

6.      Based on my training and experience, and based on the information set forth in this affidavit, I submit there is probable cause to believe that on June 23, 2025, in the District of New Hampshire, Perez Mejia possessed with intent to distribute controlled substances, namely, fentanyl and crack cocaine, in violation of Title 21, United States Code, Section 841(a)(1) ("Target Offenses").

7.      Based on my training and experience, and based on the information set forth in this affidavit, I further submit there is probable cause to believe that the Target Telephone which agents seized from Perez Mejia on June 23, 2025 contains evidence, fruits, or instrumentalities of the Target Offenses.

Probable Cause

8.      The United States, including the Federal Bureau of Investigation, and the Drug Enforcement Administration, has been conducting a federal narcotics investigation into a DTO which agents believe is led by Carlo de los Santos Ruiz, a.k.a. "Julio." This Santos Ruiz DTO utilized a "dispatch"-style method of

distribution, which I know from my training and experience is a common distribution method utilized by DTOs based in Massachusetts that operate in New Hampshire: a customer (the drug buyer) in Manchester, New Hampshire calls a dispatch telephone line and speaks with a dispatcher (the drug dealer) to arrange the purchase of narcotics, and the dispatcher either drives themself or sends one of their subordinates (the "runner") to drive from Massachusetts to Manchester to meet with the customer at an agreed-upon meeting location and conduct the drug transaction.

9.    Since March 2025, a UC has conducted approximately eleven (11) controlled buys for amounts of suspected crack cocaine by contacting the Santos Ruiz DTO's account on the Signal application. The Santos Ruiz DTO's Signal username/account was associated with the same assigned call number as the Target Telephone: (603) 818-0291.[1] On May 7, 2025, a federal Grand Jury in the District of New Hampshire indicted Santos Ruiz and several co-conspirators for one count of conspiracy to distribute a controlled substance, namely, fentanyl and cocaine, under Docket No. 25-cr-42-LM-AJ-01/04.

10.    On June 18, 2025, agents arrested Santos Ruiz and a codefendant at a residence in Dorchester, Massachusetts. During those arrests, law enforcement seized several cell phones. One of those seized phones could have been the Target

---

[1]    Between approximately July 10, 2024, and June 10, 2025, agents utilized two CSs and the UC to conduct a total of twenty-one (21) controlled buys for amounts of fentanyl and crack cocaine from the Santos Ruiz DTO by contacting several different dispatch lines and the Signal username/account associated with the Target Telephone.

Telephone because during a surveillance operation on May 22, 2025, agents saw Santos Ruiz walking in a public park near the residence of his arrest and, when an agent called the assigned call number for the Target Telephone, not through Signal, Santos Ruiz appeared to retrieve a cell phone from his left coat pocket, briefly manipulate it at waist level, and then place it back into his coat pocket, apparently "screening" that call.

11.     Nevertheless, on June 23, 2025, agents were monitoring location data[2] for the Target Telephone and learned that it was pinging in various areas of Manchester despite the fact that Santos Ruiz and a codefendant had been arrested just days earlier. That same afternoon, the UC made a recorded call to the Santos Ruiz DTO through Signal. A male answered and agreed to meet the UC and asked the UC to send a location for where the drug deal was to occur. The UC asked, in substance, whether the male was available to meet. While the pair did not specifically discuss a drug deal, based on past interactions with the Signal username/account associated with the Target Telephone, and the fact that the UC has only contacted this Signal username/account to buy drugs, specifically, crack cocaine, it was implied that this meeting was for the sale of drugs.

12.     The UC messaged the Santos Ruiz DTO on Signal to meet at 21 W. River Drive in Manchester. The Signal username/account associated with the Target

---

[2]     On June 4, 2025, United States Magistrate Judge Talesha L. Saint-Marc had authorized a GPS/ping warrant for the Target Telephone, under Docket No. 25-mj-107-01-TSM.

Telephone was under the name "Julio Julio," which agents had previously identified during a controlled buy on May 13, 2025.[3] The Signal username/account associated with the Target Telephone responded that they would arrive in approximately nine minutes.

13.     Shortly thereafter, agents conducting surveillance observed a gray 2013 Hyundai Elantra with New Hampshire plate: 5385338 ("gray Elantra") arriving at the meeting location. Moments later, the UC received a call on Signal where a male voice told the UC that they were in a "gray Sonata." I have reviewed the UC's video recording of this call and it sounded like the male voice was unsure of the type of car he was driving. Moreover, I know that Hyundai also makes the Sonata and that this gray Elantra was the only car that was arriving to the meeting location at the time of the call to the UC. Nevertheless, this gray Elantra was used as a "runner" car during a previous controlled buy of fentanyl on August 22, 2024. It should also be noted that after that previous controlled buy from a "runner" who identified himself as "Jamie," agents followed the gray Elantra back to an area near Georgetowne Drive in the Hyde Park neighborhood of Boston. Perez Mejia's Massachusetts driver's license lists an address on Georgetowne Drive.

14.     After the gray Elantra parked, agents then converged on the vehicle, removed the driver and sole occupant inside, Perez Mejia, and detained him. In plain view on the driver's seat was a black iPhone. Prior to any search of the vehicle, agents

---

[3]     During this investigation, agents had also observed that this username/account had been under the name "Julio."

called the assigned call number for the Target Telephone, not through Signal, and observed the black iPhone ringing on the driver's seat. I know that drug traffickers routinely use cell phones like the Target Telephone to conduct their business. Cell phones are used to communicate with suppliers, customers, and other co-conspirators. Agents also ran a narcotics-detecting K-9, named Otis, around the gray Elantra but that K-9 did not alert to the presence of the odor of narcotics.

15.     Agents searched the gray Elantra and found inside the driver's seat door pocket two 8-ounce bottles of Ensure Plus. Inside those two bottles were multiple small tied-off plastic baggies containing amounts of suspected fentanyl (18 baggies weighing approximately 57.65 grams) and crack cocaine (44 baggies weighing approximately 43.55 grams). Agents conducted a field test on the suspected crack cocaine which was positive for traces of a cocaine-based substance. By policy, agents did not field test the suspected fentanyl, however, I believe based on my training, experience, and familiarity with fentanyl that this substance was fentanyl based on its color and consistency (i.e., it was a tan powdered substance). I know that drug traffickers use small tied-off plastic baggies to package drugs for distribution. Agents also recovered various identification cards depicting Perez Mejia. See Figures 1-3 (below).





*Figure 1*                                    *Figure 2*



*Figure 3*

16.     In the gray Elantra's backseat armrest/cupholder was approximately $1,000 cash and on Perez Mejia's person was approximately $400 cash. I know that drug traffickers often keep large sums of money, which are either the proceeds from drug sales or monies to be used to purchase controlled substances.

17.     Perez Mejia told agents that the gray Elantra was not his car and did not know who the registered owner was. Perez Mejia said he worked for DoorDash. Agents found in the trunk of the gray Elantra a bag containing food but it did not appear to be related to DoorDash. I know that DoorDash is a food delivery application where users commonly pay for food deliveries through the application using a credit or debit card or other electronic payment method and not with cash.

18.     The Target Telephone is currently in FBI custody at a secure FBI office in Manchester, New Hampshire. In my training and experience, I know that the Target Telephone has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when law enforcement seized the Target Telephone from Perez Mejia on June 23, 2025.

19.     Based on my training and experience, and based on the facts and circumstances of this narcotics investigation, I submit there is probable cause to believe that evidence, fruits, or instrumentalities of the Target Offenses will be found on the Target Telephone because: 1) the Target Telephone was pinging in Manchester, New Hampshire only days after agents arrested the suspected leader of the Santos Ruiz DTO in Dorchester, Massachusetts; 2) Perez Mejia was driving a "runner" car (gray Elantra) used during a previous controlled buy last August; 3)

agents observed in plain view on the driver's seat of the gray Elantra the Target Telephone ringing after calling its assigned call number; and 4) the gray Elantra contained distribution-quantities of fentanyl and crack cocaine in the driver's seat door pocket.

<u>Training and Experience Supporting Probable Cause that Evidence of Drug Trafficking Will be Found on the Target Telephone</u>

20.    Based on my training and experience, I know that those involved in drug trafficking routinely use cell phones, like the Target telephone, to conduct their unlawful business. Cell phones are used to communicate with suppliers, customers, and other co-conspirators. I know that drug traffickers often keep such cell phones inside their residences, inside their cars, or on their persons.

21.    Individuals involved in drug trafficking often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones.

22.    It is common for drug traffickers to retain cell phones, although not necessarily used, for months or longer by drug traffickers in their residences and businesses. Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them. Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug

trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

23.     Evidence of drug crimes can be found in cell phones and smartphones like the Target Telephone. Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages about drug prices, quantities, and transactions.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from most cell phones. I know, based on my training and experience, and based on the particular facts of this narcotics investigation, that drug traffickers may use encrypted chat platforms like Whatsapp, Textnow, Facebook Messenger, Signal and Instagram, to communicate with other coconspirators or individuals to whom they sell drugs about drug transactions, with people in other countries (often countries from where drugs are brought into the United States), and with people who are most cautious about law enforcement detection. Other applications like Venmo or Cashapp allow people to quickly make financial transfers to others and drug customers may use these methods to pay their sources of supply for drugs.

24.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones can be evidence of drug trafficking. Moreover, the particular numbers of and the particular numbers dialed by particular cellular

telephones can be evidence of drug trafficking. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

25.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones, like the Target Telephone, are considered "smartphones," and such smartphones (which are included in Attachment B's definition of "computer hardware"), can now function essentially as small computers. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

26.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Thus, based on my training, experience, and information provided to me by other law enforcement personnel, I am aware that individuals commonly store records of the type described in Attachment B in cell phones like the Target Telephone.

<u>Technical Terms</u>

27.     Based on my training and experience, I use the following technical terms to convey the following meanings:

        a.      Wireless telephone: A wireless telephone (or mobile telephone, or cell phone, or cellular telephone) is a handheld wireless device used for voice

and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.    Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     GPS: A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.     Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

### Electronic Storage and Forensic Analysis

28.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have

been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

29.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Target Telephone was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Target Telephone because:

a.     Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.     Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate

conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

30.     *Nature of examination*. Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

31.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night

## Conclusion

32.     Based on my training and experience, and based on the information set

forth above, I submit there is probable cause to believe that Perez Mejia committed the Target Offenses and that evidence, fruits, or instrumentalities of the Target Offenses will be found on the Target Telephone.

Respectfully submitted,

/s/ Michael J. McGee
MICHAEL J. MCGEE
Task Force Officer
Federal Bureau of Investigation

The affiant appeared before me by telephonic conference, on this date, pursuant to Fed. R. Crim. P. 4.1, and affirmed under oath the content of this affidavit and application.

Date: July 24, 2025

Time: 1:49 p.m.

/s/ Andrea K. Johnstone
HON. ANDREA K. JOHNSTONE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

## ITEM TO BE SEARCHED: TARGET TELEPHONE

The item to be searched is a black iPhone in a black case, with assigned call number: (603) 818-0291, which law enforcement seized on June 23, 2025 from Cesar Joel Perez Mejia, and which is now in the lawful custody of the Federal Bureau of Investigation ("FBI") at a secure FBI office in Manchester, New Hampshire ("Target Telephone"). See Figures 1-2 (below). This warrant authorizes the forensic examination of the Target Telephone for the purpose of identifying the electronically-stored information described in Attachment B.



*Figure 1 (Front)*



*Figure 2 (Back)*

# ATTACHMENT B
## ITEMS TO BE SEIZED

1.     All records on the Target Telephone, described and depicted in Attachment A, constituting evidence, fruits, or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1), possession with intent to distribute controlled substances, namely, fentanyl and crack cocaine, involving Carlo Miguel de los Santos Ruiz ("Santos Ruiz"), Cesar Joel Perez Mejia ("Perez Mejia"), and other known and unknown individuals, including any information or records pertaining to the following:

a. Fentanyl, crack cocaine or any other controlled substances;

b. Drug paraphernalia, including chemical diluents, weighing scales, packaging material, and any other items utilized in the manufacture, sale, or other distribution of fentanyl, crack cocaine or any other controlled substances;

c. Manufacture, sale or other distribution of controlled substances, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, and records of expenditures made to purchase controlled substances;

d. Order, receipt, possession, transportation, purchase, shipment, tracking, delivery and distribution of controlled substances;

e. Types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

f. Lists of customers and related identifying information;

g. Any information involving the travel to obtain controlled substances or the transportation of controlled substances;

h. Any information related to sources of supply of controlled substances (including names, addresses, phone numbers, or any other identifying information);

i. Any information reflecting contact or communication with

coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Facebook, Snapchat, Signal, Telegram, and Instagram stored on the Target Telephone);

j.     All bank records, checks, credit card bills, account information, and other financial records (including on financial applications like CashApp and Venmo);

k.     Evidence of user attribution showing who used or owned the Target Telephone at or around the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

l.     Records pertaining to the travel or whereabouts of Santos Ruiz, Perez Mejia, and other known and unknown individuals between on or about June 2024 to present;

m.     Records pertaining to the existence, identity, and travel of any co-conspirators, as well as any co-conspirators' acts taken in furtherance of the Target Offenses listed above.

2.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied

electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

Definitions

For the purpose of this warrant:

A.    "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

B.    "Data" means all information stored on storage media of any form in any storage format and for any purpose.

C.    "A record" is any communication, representation, information or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.